UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABU DHABI INVESTMENT AUTHORITY,

   Petitioner,

against

CITIGROUP INC.,

   Respondent.

No. 1:12-cv-00283 (GBD)

 

## MEMORANDUM OF LAW IN SUPPORT OF PETITION
## TO VACATE ARBITRATION AWARD

Peter E. Calamari, Esq.
Judd R. Spray, Esq.
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Petitioner*
*Abu Dhabi Investment Authority*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ..............................................................................5

I.     THE TRIBUNAL IMPROPERLY DENIED ADIA'S MOTION TO APPLY THE LAWS OF ABU DHABI AND THE UAE TO ADIA'S TORT CLAIMS ........................5

II.     THE TRIBUNAL IMPROPERLY DENIED ADIA'S MOTIONS TO COMPEL DISCOVERY DIRECTLY RELEVANT TO ADIA'S CLAIMS .......................................6

     A.     ADIA's Motion To Compel Discovery Concerning Whistleblower Richard Bowen ...............................................................................................8

     B.     ADIA's Motion To Compel Discovery From Citigroup's Bank Examiners ..........11

ARGUMENT ......................................................................................................12

I.     APPLICABLE STANDARDS FOR VACATING THE AWARD ..................................12

     A.     The Award Should Be Vacated Pursuant to the Convention................................13

     B.     The Award Should Be Vacated Pursuant to the FAA............................................14

     C.     The "Manifest Disregard of the Law" Doctrine Applies to the Inexplicable Rulings of the Tribunal in This Case .......................................15

II.     THE TRIBUNAL'S REFUSAL TO APPLY ABU DHABI OR UAE LAW TO ADIA'S FRAUD AND NEGLIGENT MISREPRESENTATION CLAIMS DENIED ADIA THE OPPORTUNITY TO PRESENT ITS CASE IN A MEANINGFUL MANNER ...............................................................................16

     A.     There Are Material Differences Between New York and Abu Dhabi Law Regarding ADIA's Claims for Fraud and Negligent Misrepresentations ..............16

     B.     New York's Conflict-of-Law "Interest Analysis" Mandated Application of Abu Dhabi Law..................................................................................17

     C.     The Tribunal Manifestly Disregarded Well-Established Choice-of-Law Principles In Denying ADIA's Motion To Apply Abu Dhabi Law and Thereby Denied ADIA the Opportunity To Present Its Case In a Meaningful Way ..............................................................................18

III.     THE TRIBUNAL'S EXCLUSION OF EVIDENCE VIOLATED ADIA'S RIGHTS TO DUE PROCESS AND FUNDAMENTAL FAIRNESS ............................20

A.    The Tribunal's Refusal To Permit ADIA's Requested Discovery into the
      Whistleblower Allegations of Richard Bowen Requires This Court To
      Vacate the Award Under the Convention and FAA ............................................21

B.    The Tribunal's Denial of ADIA's Motion To Compel Bank Examiner
      Reports Requires This Court To Vacate the Award Under the Convention
      and FAA.................................................................................................................22

CONCLUSION ...................................................................................................................25

## TABLE OF AUTHORITIES

**Page**

### Cases

*Curley v. AMR Corp.,*
  153 F.3d 5 (2d Cir. 1998) ....................................................................................17

*Globe Comm'cns Corp. v. R.C.S. Rizzoli Periodici, S.p.A.,*
  729 F. Supp. 973 (S.D.N.Y. 1990)......................................................................18

*Hoteles Condado Beach v. Union De Tronquistas,*
  763 F.2d 34 (1st Cir. 1985)................................................................................22

*In re Franklin Nat'l Bank Secs. Litig.,*
  478 F. Supp. 577 (E.D.N.Y. 1979) .....................................................................23

*Intellivision v. Microsoft Corp.,*
  No. 07 Civ. 4079, 2008 WL 3884382 (S.D.N.Y. Aug. 20, 2008) ................... 17-18

*Iran Aircraft Industries v. Avco Corp.,*
  980 F.2d 141 (2d Cir. 1992)...................................................................13, 20, 22

*Krock v. Lipsay,*
  97 F.3d 640 (2d Cir. 1996)................................................................................17

*La Luna Enters., Inc. v. CBS Corp.,*
  74 F. Supp. 2d 384 (S.D.N.Y. 1999) ..................................................................18

*Principe v. Crossland Sav., FSB,* 149 F.R.D. 444 (E.D.N.Y. 1993) ..........................23

*Pyron v. Handelsbanken,*
  No. 93-5271, 1993 WL 430127 (D.C. Cir. 1993).............................................5, 23

*Seippel v. Jenkens & Gilchrist, P.C.,*
  341 F. Supp. 2d 363 (S.D.N.Y. 2004).................................................................17

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,*
  198 F.3d 88 (2d Cir. 1999)................................................................................12

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.,*
  592 F.3d 329 (2d Cir. 2010).........................................................................15, 19

*Tempo Shain Corp. v. Bertek, Inc.,*
  120 F.3d 16 (2d Cir. 1997).........................................................................14-15, 22

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,*
  126 F.3d 15 (2d Cir. 1997)................................................................................14

### Statutes

9 U.S.C. § 10 ......................................................................................... *passim*

9 U.S.C. § 202 ..............................................................................................3, 12

iii

9 U.S.C. § 208 .................................................................................................14

Convention on the Recognition and Enforcement of
    Foreign Arbitral Awards of June 10, 1958 ................................................... *passim*

Petitioner Abu Dhabi Investment Authority ("ADIA") respectfully submits this memorandum of law in support of its petition to vacate the arbitration award issued by a three-arbitrator panel of the International Centre for Dispute Resolution of the American Arbitration Association on October 14, 2011.

## INTRODUCTION

In late November 2007, Respondent Citigroup, Inc. ("Citigroup") misled Petitioner Abu Dhabi Investment Authority ("ADIA") into making a $7.5 billion investment in Citigroup stock by grossly misstating Citigroup's financial condition. By early January 2008, at the latest, it had become clear to ADIA that several statements Citigroup made to ADIA less than two months earlier had been false. After attempting unsuccessfully to resolve its differences without resort to litigation, ADIA filed an arbitration claim seeking rescission of its investment or, alternatively, money damages in an amount exceeding $4 billion. ADIA alleged, among other causes of action, that Citigroup had made fraudulent, reckless, or negligent misrepresentations to induce ADIA's investment. At the conclusion of the arbitration hearing, a three-arbitrator panel of the International Centre for Dispute Resolution of the American Arbitration Association (the "tribunal") issued an Award and Statement of Reasons (the "Award") finding that ADIA had failed to meet its burden of proof on any claim.



1



████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████    ADIA now respectfully petitions this Court to vacate the tribunal's Award because three pre-hearing decisions by the tribunal substantially prejudiced ADIA by effectively depriving it of the opportunity to present material and pertinent evidence under the proper legal standard pertaining to ADIA's tort claims.

This petition is proper under the Federal Arbitration Act ("FAA") and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("the Convention"), Article V.  The Convention applies to this dispute pursuant to the Federal Arbitration Act ("FAA"), 9 USC § 202, because ADIA is not a "citizen of the United States." Article V(1)(b) of the Convention specifies that an award may be vacated where "the party against whom the award is invoked was. . . . *unable to present [its] case*" (emphasis added). Under applicable caselaw from the Second Circuit Court of Appeals and elsewhere, this standard protects a party's right to "fundamental fairness" (a standard akin to due process).  Under the FAA, moreover, this Court is authorized to vacate an award where "the arbitrators were guilty of misconduct ... in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). Here, the tribunal's pre-hearing rulings violated "fundamental fairness" by forcing ADIA to satisfy legal standards which the tribunal knew were not properly applicable to its tort claims and by denying ADIA the right to discover certain highly relevant evidence.

**First**, the tribunal denied ADIA's pre-hearing motion to apply the laws of Abu Dhabi and the UAE to its claims for fraudulent and negligent misrepresentation. In denying ADIA's motion, the tribunal knowingly and manifestly disregarded well established New York conflicts-of-law principles (the law of the venue of the arbitration) that mandated a determination that ADIA's tort claims would be decided under the law of Abu Dhabi, not New York. This incorrect decision altered ADIA's burden of proof materially. Under UAE Federal Law No. 5 of 1985, as amended (the "Civil Code," which governs Abu Dhabi jurisprudence), a plaintiff asserting causes of action for intentional or negligent deception does not need to satisfy certain elements imposed by New York law. By forcing ADIA to satisfy the substantially higher burden of proof under New York law, in contrast to Abu Dhabi law, the tribunal manifestly disregarded the law and denied ADIA "fundamental fairness."

**Second**, the tribunal denied ADIA's motion to compel discovery concerning a Citigroup whistleblower who, in early November 2007, informed several of Citigroup's most senior officers—including two senior executives who helped negotiate and execute the Investment Agreement with ADIA—that Citigroup faced potentially significant liabilities in its vast mortgage loan portfolio. The whistleblower's allegations put Citigroup's senior management on notice, if it hadn't been already, of liabilities that had the potential to affect Citigroup's capital position, which it failed to relay to ADIA. Citigroup's knowledge of potential liabilities not disclosed to ADIA were the heart of ADIA's case; thus, the whistleblower's evidence was critical. The tribunal's denial of ADIA's motion to compel discovery concerning this issue thereby precluded ADIA from presenting key evidence material and pertinent to the dispute, further preventing ADIA from presenting its case in a meaningful manner.

**Third**, the tribunal denied ADIA's pre-hearing motion to compel production of bank examiner reports. These reports were plainly relevant to ADIA's claim that Citigroup had

misrepresented its financial health, and would have been an invaluable source for determining whether Citigroup in fact knew it faced a significant capital shortfall in November 2007. ███

████████████████████████████████████████████████████████████

████████████████████████████████████████ At least one court has observed that, "because bank examination reports may provide 'a unique and objective contemporaneous chronicle' of the events they concern, 'no satisfactory substitute may exist.'" *Pyron v. Handelsbanken*, No. 93-5271, 1993 WL 430127, *1 (D.C. Cir. 1993). The tribunal's refusal to compel production of these highly relevant bank examiner reports deprived ADIA of its right to present material and pertinent evidence to support its position and, ultimately, severely compromised its ability to present its case in a meaningful manner.

## FACTUAL BACKGROUND

ADIA filed its Statement of Claim against Citigroup on December 15, 2009, stating causes of action for common law and securities fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing. Spray Dec., Ex. 9 at 15-16. The Award summarizes much of the factual background leading to ADIA's Statement of Claim and the procedural history of the arbitration proceeding. For the sake of brevity and clarity, ADIA describes below only those pre-hearing rulings on which ADIA bases its petition to vacate the Award.

**I.    THE TRIBUNAL IMPROPERLY DENIED ADIA'S MOTION TO APPLY THE LAWS OF ABU DHABI AND THE UAE TO ADIA'S TORT CLAIMS**

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

████████████████████████

████████████████████████

██████████████

The conflict of laws rules of New York, where the arbitration took place, provide that in such circumstances, ADIA's tort claims should have been resolved under the substantive laws of Abu Dhabi and the UAE, not New York. *Id.* at 3-9. Nevertheless, with full knowledge of the relevant facts and of their mandate to apply Abu Dhabi and UAE law to ADIA's tort claims under New York conflict of law rules, the tribunal knowingly disregarded both facts and law in an Order dated December 24, 2010, (Spray Dec., Ex. 11), and a Statement of Reasons issued on December 31, 2010. *Id.*, Ex. 12. The refusal by the tribunal, which consisted of three U.S.-based arbitrators, to consider ADIA's tort claims under Abu Dhabi and UAE law was inexcusable given the undeniably international character of the parties' dispute and the fact that the proceeding was an "international arbitration," conducted through the International Centre for Dispute Resolution and subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

## II.   THE TRIBUNAL IMPROPERLY DENIED ADIA'S MOTIONS TO COMPEL DISCOVERY DIRECTLY RELEVANT TO ADIA'S CLAIMS

In its Statement of Claim, ADIA asserted that Citigroup induced ADIA to invest $7.5 billion in Citigroup through fraudulent or negligent misrepresentations concerning its expected subprime losses, its SIVs, and its capital position. Each of these misrepresentations related to Citigroup's overall financial health and the likelihood that it would need to raise additional capital in the near term to maintain acceptable capital ratios, thereby diluting ADIA's investment. ADIA claimed that "Citi's representations that it would not seek additional capital were critical to ADIA as ADIA was agreeing to convert its investment into common stock at an agreed on

conversion rate.  If Citi were to seek tens of billions of dollars in additional capital, this would dilute ADIA's investment, drive down ADIA's share price and impact on the conversion rate." Spray Dec., Ex. 9 at ¶ 40.





The tribunal's finding that ADIA failed to meet its burden of proof highlights the fundamental unfairness of two pre-hearing decisions by the tribunal that prevented ADIA from obtaining pertinent and material evidence essential to presenting its case in a meaningful manner.

### A.    ADIA's Motion To Compel Discovery Concerning Whistleblower Richard Bowen

While the arbitration was pending, the Financial Crisis Inquiry Commission ("FCIC") released certain documents to the public, including a November 3, 2007, email from Richard "Dick" Bowen to Robert Rubin, Gary Crittenden, and others.  Spray Dec., Ex. 14.  Mr. Bowen described himself as the Business Chief Underwriter for Citigroup's Real Estate Lending Correspondent channel.  *Id.* at 1.  Mr. Rubin was, at the time, a senior advisor in Citigroup's Office of the Chairman and a member of Citigroup's Board of Directors.  Mr. Crittenden was Citigroup's Chief Financial Officer.

Mr. Bowen described "breakdowns of internal controls and resulting significant but possibly unrecognized financial losses existing within our organization."  Spray Dec., Ex. 14 at 1.  He identified two specific potential liabilities within Citigroup's vast mortgage loan portfolio and expressed concern that Citigroup had not recognized significant potential losses related to those liabilities.  *Id.* at 1-2.  In Mr. Bowen's words, he had been "agonizing for some time over these issues," and felt compelled to communicate his concerns to Messrs. Rubin and Crittenden "[a]s a professional, as well as a shareholder of this company."  *Id.*  The issues raised in Mr.

Bowen's email—significant financial liabilities with the potential to affect Citigroup's capital position—appear to have been directly and materially supportive of ADIA's tort claims.

It is significant that Messrs. Rubin and Crittenden, two of Citigroup's most senior executives, received Mr. Bowen's email. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ At the very least, Messrs. Rubin and Crittenden had to disclose that they had received a report of an issue that had the potential to affect Citigroup's capital position materially.  Mr. Bowen was a high level executive employee of Citigroup.  His email alert that Citigroup faced substantially greater liability constituted "facts or circumstances" that would cause Citigroup "to change its plans" if the information Bowen reported were accurate.

Accordingly, ADIA sought the following from Citigroup in discovery:

> All Documents from October 15, 2007 to January 31, 2008, referring to, commenting on or describing the "significant but possibly unrecognized financial losses" referenced in Mr. Richard Bowen's e-mail to [Citigroup Chairman] Mr. [Robert] Rubin dated November 3, 2007 …, including any analysis prepared by or considered by Mr. Bowen that supported these assertions.

Spray Dec., Ex. 15, Request No. 35.

Citigroup refused to produce material in response to ADIA's Request No. 35.  ADIA thus moved to compel this material on August 2, 2010.  Spray Dec., Ex. 16 at 10. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

████████████████████████

████████████ The tribunal nevertheless summarily denied, without explanation, ADIA's

motion to compel material in response to its Request No. 35. *Id.*, Ex. 18.

The prejudicial impact on ADIA of the tribunal's denial of ADIA's motion to compel was

highlighted by later public revelations from Mr. Bowen confirming the seriousness of the

concerns he expressed to Citigroup. In December 2011—well after the conclusion of the hearing

and issuance of the Award—Mr. Bowen told *60 Minutes* that he was "absolutely blown away" by

the scope of defective mortgages that Citigroup was buying in 2006 and 2007. Spray Dec., Ex.

19 at 6. Starting as early as 2006, Mr. Bowen said he "did everything [he] could, from the

way—in the way of e-mail, weekly reports, meetings, presentations, [and] individual

conversations" to alert management to the problems he was identifying. *Id.* at 6-7; *see also id.*,

Ex. 20 at 7 ("These warnings were reinforced in weekly reports, emails, and discussions with

many levels of management . . ."). Mr. Bowen stated that, "My warnings, which were echoed by

my manager, went to the highest levels of the Consumer Lending Group," but that things did not

improve—in fact, the rate of defective mortgages actually increased through 2007. Spray Dec.,

Ex. 19 at 7. By the time Mr. Bowen sent the November 3, 2007, e-mail to Citigroup's senior

management, it was clear, according to Mr. Bowen, that "[s]omebody needed to pay attention.

Somebody needed to take some action." *Id.* at 8.

The problems identified by Mr. Bowen were serious and directly related to Citigroup's

capital position. ADIA, however, was not informed about these concerns before it invested $7.5

billion in Citigroup and became Citigroup's largest single shareholder. Instead, Citigroup turned

its guns on Mr. Bowen, relieving him of his responsibilities within Citigroup not long after he

sent his November 3, 2007 e-mail. *Id.*

**B.**   **ADIA's Motion To Compel Discovery From Citigroup's Bank Examiners**

ADIA also sought from Citigroup, but was denied access to, certain reports from the Federal Reserve, Federal Deposit Insurance Corporation, and Office of the Comptroller of the Currency (together, the "Agencies") concerning the Agencies' 2007 and 2008 examinations of Citigroup. By letter dated October 29, 2010, ADIA sought the tribunal's permission to propound a supplemental document request seeking "[a]ll reports of examination prepared by the Agencies for Citigroup as well as Citi's responses to the Agencies concerning those reports," to the extent the documents referred to or described Citigroup's SIVs, capital needs, or subprime exposures. *See* Spray Dec., Ex. 21, at 1. As ADIA explained, "the Agencies' reports of examination, and Citi's responses, are highly relevant and material evidence concerning Citi's knowledge of its true capital needs around the time of ADIA's investment and potentially critical to the adjudication of ADIA's claims." *Id.* In a subsequent letter to the tribunal dated November 3, 2010, ADIA requested a hearing to address the "appropriate scope and application of the bank examiner's privilege." Spray Dec., Ex. 22.

The tribunal refused to grant a hearing on this critical issue, and instead summarily denied ADIA's request to propound its proposed supplemental document request. Spray Dec., Ex. 23. Thus, ADIA was deprived of information that could well have revealed Citigroup's own estimates of losses and capital needs in 2007, which may have exceeded the amounts Citigroup disclosed to ADIA.

*      *      *

The significance of the tribunal's refusal to compel evidence concerning Mr. Bowen and the bank examiner reports has become even clearer when viewed in light of the Award, wherein the tribunal simply disregarded other evidence presented by ADIA. The tribunal ignored, for example, evidence of Citigroup's history of manipulating disclosures regarding its vast mortgage

11

subprime portfolio.  The evidence established that, at every available point throughout 2007, Citigroup deliberately delayed and minimized its subprime exposure and loss disclosures, beginning long before ADIA came into the picture.  As the SEC would later find, even prior to November 2007, Citigroup had been misleading investors for months as to the magnitude of its subprime exposure.  Spray Dec., Ex. 24.



## ARGUMENT

**I.**   **APPLICABLE STANDARDS FOR VACATING THE AWARD**

The FAA requires that the Convention apply to commercial arbitration agreements and awards involving entities from different countries, exempting only agreements that are "entirely between citizens of the United States."  9 USC § 202.  Because ADIA is a public institution established under the laws of the Emirate of Abu Dhabi and Citigroup is a Delaware corporation with principal headquarters in New York, the Convention governs the Award and ADIA's Petition To Vacate.  *See Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 92 (2d Cir. 1999).

A.    **The Award Should Be Vacated Pursuant to the Convention**

The Convention spells out its requirements for vacating an arbitration award in Article V.

Of most direct relevance here is Article V(1)(b), which states in pertinent part:

> 1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority … proof that: …
>
>> (b) The party against whom the award is invoked was . . . ***unable to present his case***…

(Emphasis added.)

In *Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141 (2d Cir. 1992), the Second Circuit affirmed the refusal to enforce an arbitration award under Convention Article V(1)(b) on the ground that the losing party's due process rights were violated because the tribunal refused to allow it to introduce crucial evidence in support of its claims. The Second Circuit first reiterated that violation of a party's due process rights provides good reason for not enforcing an award under Article V(1)(b):

> We have recognized that the defense provided for in Article V(1)(b) essentially sanctions the application of the forum state's standards of due process, and that due process rights are entitled to full force under the Convention as defenses to enforcement. Under our law, the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. Accordingly, if [Claimant] was denied the opportunity to be heard in a meaningful time or in a meaningful manner, enforcement of the Award should be refused pursuant to Article V(1)(b).

*Id.* at 145-146 (internal citations and quotation marks omitted).

The Second Circuit went on to hold that the arbitration tribunal's refusal to let the claimant introduce invoices crucial to its claims rendered the award unenforceable. "[T]he tribunal denied [Claimant] the opportunity to present its claim in a meaningful manner. Accordingly, [Claimant] was 'unable to present [its] case' within the meaning of Article V(1)(b), and enforcement of the Award was properly denied." *Id.* at 146. The denial of due process

rights preserved by Article V(1)(b) can justify vacating an award not only where key evidence was excluded, but also where an arbitration tribunal has refused to grant a party's request for discovery of such evidence.

**B.    The Award Should Be Vacated Pursuant to the FAA**

The Convention is not exclusive.  The FAA's requirements governing domestic arbitration disputes also are applicable to international arbitration disputes as long as they are "not in conflict with ... the Convention."  9 U.S.C. § 208.  This provision is consistent with the Convention, which envisions that an arbitration award also may be "set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." Convention Art. V(1)(e).  Thus the standards for vacating an arbitration award contained in 9 USC § 10 are also applicable to ADIA's Petition To Vacate.  *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir. 1997).  Accordingly, ADIA also brings this petition under 9 U.S.C. § 10(a)(3), which authorizes this Court to vacate an award where "the arbitrators were guilty of misconduct ... in *refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced"* (emphasis added).

Courts have interpreted the requirements of § 10(a)(3) in much the same way as Convention Article V(1)(b).  The Second Circuit in *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16 (2d Cir. 1997), vacated an award challenged under § 10(a)(3) on the ground that the tribunal improperly excluded testimony of a witness as cumulative.  The Second Circuit ruled that the excluded testimony was vital to the losing party's claim (similar to ADIA's claim here) that there was fraudulent inducement to enter into a contract.  The court first observed that the principle underlying § 10(a)(3) is to preserve the fundamental fairness of an arbitration proceeding:

[A]lthough not required to hear all the evidence proffered by a party, an arbitrator must give each of the parties to the dispute an adequate opportunity to present its evidence and argument.  Federal courts do not superintend arbitration proceedings.  Our review is restricted to determining whether the procedure was fundamentally unfair.

*Id.* at 20 (internal citations and quotation marks omitted).

Applying this standard, the Second Circuit then concluded:

We find that there was no reasonable basis for the arbitration panel to determine that Pollock's omitted testimony would be cumulative with regard to the fraudulent inducement claims.  Said differently, the panel excluded evidence plainly 'pertinent and material to the controversy,' 9 U.S.C. § 10(a)(3).... [T]here is nothing to suggest that Pollock's intended testimony concerning appellees' fraudulent inducement claim and [appellant's] counterclaim for fraudulent inducement was addressed by the documents admitted into evidence.... On the facts of this case, the panel's refusal to continue the hearings to allow Pollock to testify amounts to fundamental unfairness and misconduct sufficient to vacate the award pursuant to § 10(a)(3) of the FAA.

*Id.* at 20-21.

### C.   The "Manifest Disregard of the Law" Doctrine Applies to the Inexplicable Rulings of the Tribunal in This Case

In addition to the specifically enumerated grounds for vacating an arbitration award contained in the Convention, Article V, and in the FAA, 9 U.S.C. § 10, courts have held that an arbitration award may be vacated under § 10(a)(3) where a tribunal has misbehaved, to the material prejudice of a party, by making a ruling which represents a "manifest disregard for the law."  Recent cases have clarified that "manifest disregard of the law" by an arbitral tribunal supports vacatur under the express provisions of the FAA.  *See, e.g., T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010).

II. **THE TRIBUNAL'S REFUSAL TO APPLY ABU DHABI OR UAE LAW TO ADIA'S FRAUD AND NEGLIGENT MISREPRESENTATION CLAIMS DENIED ADIA THE OPPORTUNITY TO PRESENT ITS CASE IN A MEANINGFUL MANNER**

For the reasons that follow, the tribunal's denial of ADIA's Motion To Apply Abu Dhabi Law constitutes a manifest disregard of the law, denied ADIA the opportunity to present its case in a meaningful manner, and requires vacatur of the Award.

A. **There Are Material Differences Between New York and Abu Dhabi Law Regarding ADIA's Claims for Fraud and Negligent Misrepresentations**



███████████████████████████████████

███████████████████████████████████

███████████████████████████████ The tribunal's

improper denial of ADIA's motion thus imposed different, more difficult burdens on ADIA in

attempting to prove its claims.

**B.**   **New York's Conflict-of-Law "Interest Analysis" Mandated Application of Abu Dhabi Law**

In ruling on ADIA's Motion To Apply Abu Dhabi Law, the tribunal concluded that "[t]he

Parties only designated New York law as applicable to breach of contract and other contract-

related claims," while not specifying which law "should apply to fraud and misrepresentation

claims such as those asserted by ADIA." Spray Dec., Ex. 12 at 2.  To resolve the choice of law

question regarding ADIA's tort claims, the tribunal first determined that "there is sufficient

apparent conflict between the relevant laws of New York and the UAE/Abu Dhabi to lead us also

to apply New York's interest analysis." *Id.* at 3 (citing *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d

Cir. 1998)).

Under New York interest analysis, "the laws of the jurisdiction having the greatest

interest in the litigation is applied." *Curley*, 153 F.3d at 12.  To decide which jurisdiction has a

greater interest in the litigation, courts will generally look to the domiciles of the parties and to

the location of the tort and the resulting injury.  When there is a conflict, courts conduct an

interest analysis.  See *Krock v. Lipsay*, 97 F.3d 640, 645-46 (2d Cir. 1996); *see also Seippel v.

Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 377 (S.D.N.Y. 2004) ("When a choice of law

issue relates to laws regulating conduct, such as fraud, the locus of the tort determines the

applicable law.").  The locus of the tort is, in turn, determined by where the plaintiff was harmed.

*Intellivision v. Microsoft Corp.*, No. 07 Civ. 4079, 2008 WL 3884382, at *5 (S.D.N.Y. Aug. 20,

2008) ("'A cause of action for fraud arises where the loss is sustained and that loss from fraud is

deemed to be suffered where its economic impact is felt, normally, the plaintiff's residence.'")

(*citing Sack v. Low*, 478 F.2d 360, 365-66 (2d Cir. 1973); *La Luna Enters., Inc. v.CBS Corp.*, 74

F. Supp. 2d 384, 389 n.2 (S.D.N.Y. 1999) ("[t]he locus of a tort is generally determined by the

place where the plaintiff suffered injury"); *Globe Commc'ns Corp. v. R.C.S. Rizzoli Periodici,*

*S.p.A.*, 729 F. Supp. 973, 976 (S.D.N.Y. 1990) (finding Florida law to apply to fraud claims

where plaintiff "acted in reliance in Florida and incurred loss in Florida").

    In the instant case, the locus of the fraud under New York choice-of-law principles was

unquestionably Abu Dhabi. ███████████████████████

███████████████████████████

███████████████████████████

████████████████ ██████████████

█████████████████████████████

███████████████████████████████

██████████████████████

███████████████████████████

█████████████████████████████

███████████████████████████████

███████████████████████████

████████████████

**C.**    <u>**The Tribunal Manifestly Disregarded Well-Established Choice-of-Law**</u>
<u>**Principles In Denying ADIA's Motion To Apply Abu Dhabi Law and**</u>
<u>**Thereby Denied ADIA the Opportunity To Present Its Case In a Meaningful**</u>
<u>**Way**</u>

    Despite having been made aware of the law and facts above, the tribunal denied ADIA's

Motion To Apply Abu Dhabi Law, stating:  "While ADIA's contention that Abu Dhabi's interests

are significant is a reasonable one, when we view all relevant facts in the context of what we see

as New York's significant interest in regulating New-York-based [*sic*] conduct of financial institutions in transactions of this kind, we conclude that New York's interests are, on balance, more significant than Abu Dhabi's." Spray Dec., Ex. 12 at 4.  As discussed above, an arbitration award must be vacated under the Convention, Article V, and the FAA, 9 U.S.C. § 10, if any significant rulings by the arbitrators were in "manifest disregard of the law."  The most recent description of the requirements for establishing "manifest disregard of the law," articulated by the Second Circuit Court of Appeals in *T.Co Metals*, bears repeating here:

> We have recognized three components to this Circuit's application of the manifest disregard standard:  First, we *must consider whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators*. . . .  Second, . . . we *must find that the law was in fact improperly applied, leading to an erroneous outcome*. . . .  Third, . . . *we look to a subjective element, that is, the knowledge actually possessed by the arbitrators.  In order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability* to the problem before him."

592 F.3d at 339 (emphasis added) (internal quotation marks omitted).

Each of the "manifest disregard" factors is present here:  (i) the conflict of law principles pertaining to ADIA's tort claims were clear and "explicitly applicable to the matter before the arbitrators"; (ii) the principles were "improperly applied"; and (iii) the principles were properly brought to the attention of the tribunal before it issued its ruling and yet were completely disregarded.

First,  as discussed at length above, New York law is clear that the locus of fraud and negligent misrepresentation occurs where the claimant suffers injury, not where the fraudulent misrepresentations originated.  Thus, ADIA has satisfied the first part of the "manifest disregard" test, *i.e.*, "the law . . . was clear" and was "explicitly applicable to the matter before the arbitrators."  Second, there can be no question that "the law was improperly applied."  Rather than applying well-settled New York conflict of law rules, the tribunal simply substituted its own judgment for this extensive body of law.

19

Third, there can be no question that the tribunal "intentionally disregarded the law" because the arbitrators knew of its existence, and its applicability to the problem before them. ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████Yet the tribunal chose simply to disregard the legal principles set forth in those decisions in favor of its own legally unsupported judgment.  This approach is the epitome of "manifest disregard of the law" and such prejudicial misbehavior by the tribunal requires this Court to vacate the arbitration award under § 10(a)(3) of the FAA.

## III.    THE TRIBUNAL'S EXCLUSION OF EVIDENCE VIOLATED ADIA'S RIGHTS TO DUE PROCESS AND FUNDAMENTAL FAIRNESS

At the core of the tribunal's Award is its conclusion that ADIA failed to prove that Citigroup knew or should have known that the inaccurate statements it made to ADIA in November 2007, immediately before the signing of the Investment Agreement, were false and misleading.  Yet when ADIA sought to discover evidence that would have verified that Citigroup had reason to believe well before the signing of the Investment Agreement that its financial condition was far worse than it was telling ADIA, the tribunal denied ADIA the right to discover and present such evidence.  These rulings triggered grounds for vacatur under both the Convention and the FAA.  Under the Convention, the rulings created a situation where ADIA was "unable to present [its] case" under Article V(1)(b), in violation of ADIA's rights of due process and fundamental fairness embodied in that section.  *Iran Aircraft*, 980 F.2d at 145. Under the FAA, the rulings constituted a clear refusal by the tribunal "to hear evidence pertinent and material to the controversy" in violation of § 10(a)(3).  Given the high degree of relevance which the excluded evidence would have had to ADIA's tort claims, ADIA was substantially

prejudiced by these rulings.  Thus, this Court is obligated to vacate the award under both the

Convention and the FAA.

    **A.**    **The Tribunal's Refusal To Permit ADIA's Requested Discovery into the Whistleblower Allegations of Richard Bowen Requires This Court To Vacate the Award Under the Convention and FAA**

    Mr. Bowen's whistleblower e-mail to Robert Rubin, Gary Crittenden, and others,

described above, pertained directly to the question of whether Citigroup was aware, in November

2007, of circumstances that might materially increase its estimated near-term losses and need for

future capital.  Documents from Citigroup employees discussing or illuminating Mr. Bowen's

concerns would have been pertinent evidence to the controversy, to which ADIA was denied

access.

    Three weeks after Mr. Bowen's email warning of significant liabilities in its vast

mortgage portfolio, Citigroup nevertheless assured ADIA that its expected subprime write-offs

were still in the range of $8-$11 billion and that it "had no plans to raise more than $12 billion in

capital," including ADIA's $7.5 billion. ███████████████████

████████████████████████████

████████████████████████

████████████████████████████

████████████████████████████

██████████████████ Documents related to Bowen's assertion on

November 3, 2007, that Citigroup was facing "significant but possibly unrecognized financial

losses" obviously would have shed light on whether Citigroup knew or had reason to believe at

that time that it would need a much bigger infusion of capital than it was telling ADIA.  Indeed,

it is difficult to conceive of documents that would be more relevant to this issue than documents

containing discussions of significant losses in the imminent future. ████████████

███████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████   A single

email from a Citigroup executive admitting that the company's losses and capital needs might

indeed be higher than anticipated (as Mr. Bowen had warned), would have met that burden.  The

tribunal denied ADIA access to discovery concerning Mr. Bowen's email, however, and ADIA

subsequently could not justify using its limited time at the hearing to explore the issues raised by

Mr. Bowen (even assuming the tribunal would have allowed ADIA to do so).

In sum, the refusal of the tribunal to permit ADIA's requested discovery of documents

referring to, commenting on, or describing the "significant but possibly unrecognized financial

losses" referenced in Mr. Bowen's e-mail of November 3, 2007, resulted in ADIA being "unable

to present [its] case" under Article V(1)(b) of the Convention and violated ADIA's rights of

fundamental fairness embodied in that section.  *Iran Aircraft*, 980 F.2d at 145.  In addition, the

tribunal's order denying this crucial discovery violated the FAA, 9 USC § 10(a)(3), since it

proved that "the arbitrators were guilty of misconduct ... in refusing to hear evidence pertinent

and material to the controversy" that substantially prejudiced ADIA.  *See Tempo*, 120 F.3d 16;

*Hoteles Condado Beach v. Union De Tronquistas*, 763 F.2d 34, 39 (1st Cir. 1985).  Accordingly,

this Court should vacate the tribunal's award under the Convention and the FAA.

**B.**     **The Tribunal's Denial of ADIA's Motion To Compel Bank Examiner Reports Requires This Court To Vacate the Award Under the Convention and FAA**

Finally, the tribunal's denial of ADIA's request for bank examiner reports—without even

hearing argument on the scope of the bank examiner's privilege—also provides grounds for

vacatur under Article V.1(b) of the Convention and § 10(a)(3) of the FAA.

ADIA had sought the bank examiner reports—or, at a minimum, a hearing on the scope

of the bank examiner's privilege—because of their direct relevance to Citigroup

misrepresentations with regard to its subprime exposure, SIVs, and capital-raising plans.

Numerous courts have recognized the unique evidentiary value of bank examiner reports for

determining the true state of a financial institution.  In *Pyron*, for example, the D.C. Circuit

observed that, "because bank examination reports may provide a unique and objective

contemporaneous chronicle of the events they concern, no satisfactory substitute may exist."

1993 WL 430127 at *1 (internal quotation marks omitted) (remanding to district court to

reconsider its decision not to subpoena the requested bank examination reports).  The court in *In

re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 577 (E.D.N.Y. 1979), similarly held that "[t]he

Examination Reports provide a unique and objective contemporaneous chronicle of the financial

decline of [the] Bank; no satisfactory substitute exists." *Id.* at 586; *see also Principe v.*

*Crossland Sav., FSB*, 149 F.R.D. 444, 450 (E.D.N.Y. 1993) ("[A]n overwhelming majority of

courts that have considered the disclosure of reports of bank examiners have ruled in favor of

their production, and the FDIC has failed to cite any cases to the contrary.").

Reports of Citigroup's bank examiners would likely have proved invaluable to proving

ADIA's claims.  This assertion is not merely speculative—in a "Conclusion Memorandum,"

released in connection with the FCIC's investigation, the OCC was highly critical of Citigroup's

policies and procedures with regard to its subprime portfolio.  Spray Dec., Ex. 27.[1]  During the

hearing and in post-hearing briefs, ADIA attempted to prove the falsity of Citigroup's statements

concerning its financial health by demonstrating, *inter alia*, that Citigroup's Tier 1 capital ratio in

Fall 2007 was far below its historical average, and that Citigroup's true objective, contrary to its

statements to ADIA, was to raise additional capital in increments to increase its Tier 1 and other

capital ratios and create a "fortress-like balance sheet." ███████████████

███████████████████████████████████████████



The  tribunal's denial of bank examiner files to ADIA, without conducting the hearing ADIA requested to argue its position on the bank examiner's privilege, deprived ADIA of potentially critical evidence to prove its case, triggering grounds for vacatur under the above-cited provisions of the Convention and the FAA.[3]

---

[1]  The tribunal appears to have disregarded this memorandum.

## CONCLUSION

For the foregoing reasons, ADIA respectfully requests that this Court grant ADIA's

Petition To Vacate the Award.


Dated:  February 29, 2012                    Respectfully submitted,

                                             QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP


                                      By:    /s/ Peter E. Calamari
                                             Peter E. Calamari, Esq.
                                             Judd R. Spray, Esq.

                                             Attorneys for Petitioner
                                             ABU DHABI INVESTMENT AUTHORITY